Opinion filed July 17, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00143-CR
_____

## CHARLES JASON MORSE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. 14608**

## M E M O R A N D U M   O P I N I O N

The jury found Charles Jason Morse guilty of the murder of Kimberly Morse and assessed his punishment at imprisonment for ninety-nine years. The trial court sentenced Appellant accordingly. We affirm.

## I. *Issues Presented*

Appellant challenges his conviction in three issues. Appellant first asserts that the trial court abused its discretion when it ruled, after a *Jackson v. Denno*[1] hearing, that Appellant's statements were voluntary and admissible. Appellant next asserts that the trial court abused its discretion when it denied his motion for new trial without holding a hearing. Appellant argues in his third issue that his trial counsel was ineffective because counsel failed to preserve his right to confrontation at the *Jackson v. Denno* hearing and because he did not request a jury instruction on the defense of "necessity" in the guilt/innocence phase of trial or a jury instruction on "sudden passion" in the punishment phase of trial.

## II. *Pretrial Jackson v. Denno Hearing*

Appellant requested a hearing to determine if his statements[2] given to law enforcement on March 6–8, 2011, were voluntary. The trial court began a *Jackson v. Denno* hearing on March 2, 2012, and completed the hearing prior to trial on March 6, 2012. The State and Appellant agreed on the authenticity of the recorded statements. At the hearing, the State stipulated that it would not use the first two statements but stated that it intended to introduce the third statement as evidence at trial.

The State argued that Captain Craig Goen of the Palo Pinto County Sheriff's Department had advised Appellant of his *Miranda*[3] rights and that Appellant had stated that he understood those rights, waived those rights, and voluntarily chose to speak with Captain Goen and Texas Ranger Anthony Bradford at the sheriff's

---

[1]*Jackson v. Denno*, 378 U.S. 368, 375–77 (1964) (defendant deprived of due process if conviction is based, in whole or in part, on an involuntary confession without regard to truth or falsity).

[2]Appellant gave three statements: the first statement on March 6–7, 2011; a second statement later in the day on March 7, 2011; and a third statement on March 8, 2011. All three interviews were conducted at the Palo Pinto County Sheriff's Department.

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

department on March 8, 2011. The State argued that the interview, which was videotaped, contained all of the *Miranda* warnings and Appellant's waiver of his *Miranda* rights before any questioning began.

The trial court reviewed the three videotapes, heard the arguments of counsel, and then ruled that all three of Appellant's statements to law enforcement were made voluntarily after he had been advised of his *Miranda* rights and had voluntarily chosen to waive those rights. The trial court held that the *Miranda* warnings complied with the United States and Texas Constitutions, all federal and Texas statutory laws, and all applicable federal and Texas appellate decisions concerning the questioning of an accused and the recording of any statements by the accused.

The trial court also found and held that Appellant's counsel was given the opportunity to review Appellant's three videotaped statements and was furnished accurate copies of those statements prior to the time that the third statement was offered into evidence. The trial court noted that Appellant's counsel was given the opportunity to call and to cross-examine witnesses at the hearing, but no witnesses were called to testify by either side.

### III. *The Evidence at Trial*

Appellant shot and killed his aunt, Kimberly Morse, during an argument. Afterward, he drove to the home of Lloyd and Leisha South, his stepfather and mother, with Kim's body in the bed of his pickup. Appellant had blood on his jeans, shirt, and both hands. Appellant told Lloyd that "Kim had been killed." Lloyd saw an arm sticking out from underneath a mattress in the bed of the pickup. Lloyd called 911 upon making these observations.

Deputy Randy Hunter of the Palo Pinto County Sheriff's Department responded to the call. Deputy Hunter testified that he saw blood on various parts

of the pickup; a mattress in the bed of the pickup, which also had blood on it; and an arm extended out from underneath a tarp that was on top of the mattress.

Captain Goen also responded to the call. He noticed an exit wound from a bullet on the victim's forehead. Captain Goen contacted Ranger Bradford to assist with the investigation. Ranger Bradford and John Branson, a crime scene investigator, conducted an investigation at the property where Kim had lived and where Appellant had killed her. Appellant also had a shop at that location. There they found a pool of blood on the ground, a nine-millimeter shell casing, and a fired nine-millimeter bullet near the pool of blood.

Ranger Bradford testified that he next interviewed several people and completed a walk-through of the property with Appellant on March 7, 2011. Appellant provided information on the location of a Ruger nine-millimeter pistol[4] that Appellant had hidden in a shirt under some rocks and leaves on the property. Parker County Deputy Sheriff Chad Jordan said that they also recovered ammunition for the pistol and heard Appellant describe events that occurred at the property the previous day.

After law enforcement officers arrested Appellant, he gave three statements to them. Captain Goen was present at all three interviews. He testified that Appellant's description of events in the first two interviews did not match the physical evidence collected and did not match his description of events in the third interview. Ranger Bradford only participated in the third interview of Appellant. Ranger Bradford testified that Appellant's description of events in the third interview did not match the statements he had given in the first two interviews; those statements also did not match the physical evidence that had been collected.

---

[4]Lloyd testified that Kim had purchased the Ruger pistol and that Appellant got the pistol from Kim. Leisha testified that she had hidden the pistol from Appellant but gave it to him when he asked for it on March 6, 2011.

4

Appellant's statements also contradicted the statements of Cody Calvin, who was present when the murder occurred. Ranger Bradford testified that there were only two shots fired from the pistol: one bullet struck Kim in the right thigh and the second one entered the back of her head and exited her right forehead.

The medical examiner who performed the autopsy confirmed Ranger Bradford's testimony and found that Kim's death was caused by a gunshot wound to the head. Expert testimony confirmed that the spent shell casing and bullet had been fired from the Ruger pistol and that blood found on Appellant's boots and clothes, the awning and two mattresses, the spent shell casing, Appellant's pickup, and the victim's clothes was the victim's blood.

Cody Calvin, who was helping Appellant with some metal work, was at the property when Appellant killed Kim. Calvin said that Kim was not at the property when he and Appellant arrived there and that Appellant had indicated that he needed to sort out some paperwork[5] with her about the property. Calvin said that, while he and Appellant were working in the shop, someone dropped Kim off there and that Appellant left the shop to speak to her; Calvin remained in the shop. Calvin said that the two began to argue, that Kim went across the street, and that Appellant followed her. Calvin said Kim returned to the property and again Appellant followed her. Calvin said that the argument got louder and that both yelled and screamed at one another; he said he knew that Appellant was not going to be able to accomplish what he said he wanted to do with the paperwork. Calvin testified that Kim said it "was her fault" and that she "was doing the best that she could." Then, Calvin suddenly heard two gunshots.

---

[5]Ranger Bradford investigated the title to the property. He testified that Kim had previously owned the property but that she had transferred it to Jacquita Ellis. Amie Mitchell of the Cannon Law firm testified that Appellant had contacted the law office to try to get a deed to property backdated. But the firm's lawyers and staff refused to assist him. Mitchell also testified that Kim had executed a statutory durable power of attorney that gave Appellant general powers. However, Kim revoked it several weeks later.

Calvin left the shop, went outside, and saw Appellant holding a pistol and standing beside Kim's body. Calvin said he ran away because he did not want to have any part of what Appellant had done. Calvin said he hid in a ditch "just in case" because he did not know what was going to happen. Calvin walked to the road, called someone to get a ride, and then went to the police in Weatherford the following day to report what he had seen. Michelle Brown corroborated part of Calvin's testimony. She testified that she had ridden her scooter down to the "rails to trails" trail and had seen Kim and Appellant walking back and forth along the road just in front of the property. Appellant was following Kim and had a gun in his hand. Brown said that the two were arguing; that Appellant slapped Kim on her buttocks, which scared Brown; and that she called 911 about the incident. She said that, as she left, Kim was walking away from Appellant.

Billy Gordon testified that he knew Kim from high school. He also knew that she lived on the property but had no water or food there. He had bought her some groceries, had let her use his shower, and had fed her. He dropped Kim off at her house around 4:00 p.m. on the day of the murder; he saw what Kim said was Appellant's pickup at the property. Gordon said that he had never met Appellant but that Kim seemed to be afraid of Appellant. When she got out of his vehicle, Kim thanked him for all of his help. Gordon testified that he did not find Kim to be irrational, but he commented that she had told him that people were trying to commit her.

David Henderson testified that, about two days before her death, Kim thought Appellant was trying to kill her. Henderson said she did not appear to be irrational that day. Appellant's friend, Mark Savage, testified that Appellant had come to his house in the late afternoon or early evening on March 6, 2011, and asked if Savage's front-end loader could dig a hole because Appellant "need[ed] a hole." Appellant also asked for a shovel. Savage said Appellant looked strange

6

and hid his hands; Savage just wanted him to leave. Savage testified that Appellant said, "That's the blood of my family," and "It was easier than I thought it was going to be."

Jewel Morse, Kim's mother, testified that she helped raise Appellant. She said that Kim and Appellant were close but that Kim changed after her father died.[6] She said Kim was volatile and had broken some of Jewel's furniture.

Appellant testified on his own behalf, after the trial court had admonished him about his rights to remain silent, not testify, and not incriminate himself and had warned him of the dangers of cross-examination by the State. Appellant said that he had a close relationship with Kim and that they had gone fishing and done other fun things together when he was growing up. He said that, as an adult, he had helped her on many occasions. He said she changed after her father's death and had trouble with the law and with her girlfriend. Appellant had gotten Kim out of jail in Oklahoma and had stayed with her in Granbury, but the situation became difficult. He said that Kim carried knives and threatened to kill him and that her girlfriend, Jacquita, had also threatened him.

Appellant learned that Kim had sold the property where she lived and where he had his shop, and he tried to get it back from her; he claimed he had worked out an agreement with Jacquita to buy the property and had tried to get some paperwork done by a law firm. He said he armed himself because he knew that she had a shotgun in the house. He said that he went to the property to talk to her but that he could not get through to her. Appellant testified that he asked Kim to leave, that the argument escalated, and that he fired several warning shots from his pistol in an attempt to get her to leave. He said he did not call the police because there

---

[6]Leisha testified that Kim's personality changed after her father's death and that she was known to carry knives. She said Appellant and Kim had difficulties in Granbury when they lived in a house that Kim had owned there. She also said that Kim used drugs and that Appellant had a drinking problem and consumed alcohol daily.

had been trouble with Kim in the past and the police were no help. Appellant said he shot Kim in the leg and head to prevent her from setting fire to the house and from getting the gun that was in the house. He testified that he acted in self-defense and defense of property. After Appellant shot Kim, he put her in his pickup and went to Savage's house and then to Appellant's mother's house.

Although Appellant and Kim were arguing over the property, Appellant testified that he did not own the property and had no legal right to be on the property or to compel Kim to leave the property. Appellant admitted that he had told several versions of events to law enforcement. He admitted that he had first told them that he found Kim dead, then later told them that she had attacked him, and then told them that he was "guilty." He testified at trial that he shot her to protect himself and his family and to protect his property. Appellant admitted that Kim was unarmed and that he had shot her in the back of the head.

## IV. *Standards of Review*

We review the decision of a trial court to admit as evidence a defendant's statement under an abuse of discretion standard. *Kearney v. State*, 181 S.W.3d 438, 444 (Tex. App.—Waco 2005, pet. ref'd) (citing *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998)). We also review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). When applying an abuse of discretion standard, we will not overturn a trial court's decision unless it falls outside the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). With respect to Appellant's complaint of ineffective assistance of counsel, we apply the well-recognized standard of review from *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

8

## V. *Discussion and Analysis*

### A. *Appellant's Interview Statements*

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion[.]" *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (alteration in original) (quoting TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005)). "A defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause."[7] *Id.* "It may be involuntary under one, two, or all three theories. A statement that is 'involuntary' as a matter of constitutional law is also 'involuntary' under Article 38.22, but the converse need not be true." *Id.*

Appellant complains that the trial court abused its discretion when, after it held a *Jackson v. Denno* hearing, (1) it ruled that Appellant had voluntarily given statements during three interviews with police on March 6–8, 2011, and (2) it denied Appellant's motion challenging the voluntariness of his statements. Appellant complains that the ruling violated three theories: article 38.22 of the Texas Code of Criminal Procedure, *Miranda*, and due process. Appellant specifically asserts that all three of his statements should have been suppressed because (1) he did not receive *Miranda* warnings; (2) if he received the *Miranda* warnings, he was inappropriately induced or coerced by Captain Goen or Ranger Bradford to waive those *Miranda* rights; and (3) if he received the *Miranda* warnings in the first two interviews, he could not have knowingly and intelligently waived his *Miranda* rights because of his intoxication, illness, and lack of medication.

---

[7]*See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2013).

We note that Appellant received *Miranda* warnings in the first two interviews; that the trial court reviewed the DVD recordings from those interviews during the *Jackson v. Denno* hearing; and that the trial court determined that Appellant's statements from those two interviews were voluntarily made after Appellant had waived his rights. Remarkably, we note that Appellant's statements from those two interviews were never introduced at trial and were not therefore subject to the exclusionary rule. *See* CRIM. PROC. art. 38.22, § 6.

Appellant also contends that the March 6–7, 2011 interviews tainted the third interview, which was on March 8, 2011. "The main purpose of *Miranda* is to ensure that an accused is *advised of and understands* the right to remain silent and the right to counsel." *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010) (emphasis added). The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of one's rights under *Miranda* and Article 38.22. *Miranda*, 384 U.S. 436; *Leza v. State*, 351 S.W.3d 344, 349, 351 (Tex. Crim. App. 2011); *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). We again note that the trial court reviewed the DVD recording of the third interview, confirmed that the *Miranda* warnings were given, confirmed that Appellant waived his rights, and then ruled that Appellant's statements in the third interview were voluntary. We further note that defense counsel agreed to the authenticity of the DVD recording of the third interview and that, when asked if he had other evidence for the *Jackson v. Denno* hearing, counsel replied, "None, your Honor."

Appellant claims that his intoxication, illness, lack of medication, and post-traumatic stress disorder rendered him unable to intelligently consent to waive his rights in the first two interviews and that those facts tainted the third interview. Appellant has failed to point to evidence from the record that explains how his condition in the first two interviews tainted the third interview, which occurred two days following the initial interview. A review of the DVD recording of the third

interview shows that Appellant was both lucid and alert and freely conversing with Captain Goen and Ranger Bradford after he was read his rights, acknowledged that he understood those rights, and waived those rights before he spoke to the officers. We have reviewed the record; it reflects that Appellant received the proper warnings, understood them, and waived them. Based on the record before us, we cannot hold that the first two interviews tainted the third interview. Further, there is no evidence that Appellant's statements in the third interview were coerced.

Appellant also argues that the trial court erred because it made its ruling on the voluntariness of Appellant's statements (1) without allowing Appellant to confront witnesses and (2) without hearing testimony from sponsoring witnesses. The trial court conducted a *Jackson v. Denno* hearing and reviewed the DVD recordings of the interviews that law enforcement conducted with Appellant. The State called no witnesses, and Appellant's counsel, who was given the opportunity to present additional evidence, called no witnesses. We review the evidence in the light most favorable to the trial court's ruling. *See State v. Terrazas*, 4 S.W.3d 720, 725 (Tex. Crim. App. 1999); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). The court's findings may not be disturbed on appeal absent a clear abuse of discretion. *Kearney*, 181 S.W.3d at 443–44. The State had the burden to prove the voluntariness of Appellant's statements, and it did so when it presented the DVD recordings. Based upon this record, we cannot say that the trial court abused its discretion when it admitted the third statement into evidence. We overrule Appellant's first issue.

*B. Motion for New Trial*

Appellant argues in his second issue that the trial court abused its discretion when it denied his motion for new trial without holding a hearing. An appellate court reviews a trial court's denial of a motion for new trial under an abuse of discretion standard. *Smith v. State*, 286 S.W.3d 333, 339–40 (Tex. Crim. App.

11

2009); *State v. Herndon*, 215 S.W.3d 901, 905–06 (Tex. Crim. App. 2007) (citing *Holden v. State*, 201 S.W.3d 761, 763–64 (Tex. Crim. App. 2006)). A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Holden*, 201 S.W.3d at 763 (citing *Rivera v. State*, 89 S.W.3d 55, 58–59 n.9 (Tex. Crim. App. 2002)).

"A trial court abuses its discretion in failing to hold a hearing when a defendant presents a motion for new trial raising matters not determinable from the record." *Holden*, 201 S.W.3d at 763; *see also King v. State*, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000). The purpose of a hearing on a motion for new trial is (1) to determine whether the case should be retried or (2) to complete the record for presenting issues on appeal. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009) (citing *Smith*, 286 S.W.3d at 338). The goal of the hearing is to fully develop the issues raised in the motion and the accompanying affidavits. *Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994). However, live testimony is not required; a trial court may rule based on sworn pleadings and affidavits without oral testimony. *Holden*, 201 S.W.3d at 763. "It has long been held that a trial court may decide a motion for new trial based on sworn pleadings and affidavits admitted in evidence without hearing oral testimony." *Id.*

As a prerequisite to securing a hearing on a motion for new trial, the defendant is required to support the motion with an affidavit specifically showing the truth of the grounds for attack before a hearing will be granted. *King*, 29 S.W.3d at 569; *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993). The affidavit need not reflect each and every component legally required to establish relief but, rather, must reflect that reasonable grounds exist for holding that such relief could be granted. *Martinez v. State*, 74 S.W.3d 19, 21–22 (Tex. Crim. App. 2002) (citing *Jordan*, 883 S.W.2d at 665; *Reyes*, 849 S.W.2d at 816).

Appellant filed his motion for new trial and attached sixteen exhibits that included 158 pages of information. His exhibits included twelve affidavits, a copy of a power of attorney and a subsequent revocation by Kim, Kim's medical records, and deeds showing Kim had received and sold property. The exhibits also included police reports, a fire department call sheet, and a news article. The remaining exhibits included a psychological evaluation of Appellant, appointment orders for an investigator and psychologist, and invoices from defense counsel and a psychologist. Because the trial court is to review only sworn pleadings and affidavits, we will not review any information attached to the motion for new trial that was not presented under oath. *Holden*, 201 S.W.3d at 763.

Appellant's motion was not sworn, but he did attach affidavits from twelve people. Appellant filed a memorandum in support of the motion and a response with an affidavit attached. Eleven of the first twelve affidavits go into some detail about the relationship each affiant had with Appellant and the affiant's recollection of rude, bad, negative, or illegal acts of the victim as well as multiple character flaws of the victim. The affiants also described medical conditions of the victim and alleged that Appellant always tried to help and care for the victim. But Appellant does not describe how any of this evidence was unavailable prior to trial or how it fits within the definition of newly discovered evidence.

A motion for new trial, based on newly discovered evidence, has to meet the following four-part test:

(1)     the newly discovered evidence was unknown or unavailable to the movant at the time of his trial;

(2)     the movant's failure to discover or obtain the evidence was not due to a lack of diligence;

(3)     the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and,

> (4) the new evidence is probably true and will probably bring about a different result on another trial.

*Duke v. State*, 365 S.W.3d 722, 728 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Keeter*, 74 S.W.3d at 36–37); *see* CRIM. PROC. art. 40.001 (West 2006); *Driggers v. State*, 940 S.W.2d 699, 708 (Tex. App.—Texarkana 1996, pet. ref'd).

All of the affidavits and the other information presented were either cumulative or impeaching in nature, and the information could have been secured prior to trial. No evidence was adduced in the affidavits that raised issues not determinable from the record or issues that provided reasonable grounds either to hold a hearing or to grant the requested relief. Furthermore, none of the proffered information, even if probably true, would probably have brought about a different result in another trial; the evidence of Appellant's guilt, based on eyewitness testimony and forensic evidence, was overwhelming. No evidence was adduced in the motion or the affidavits to enable someone to reach the conclusion that no reasonable view of the record could support the trial court's ruling.

Appellant also asserted there was a conflict of interest between his trial counsel (Richard P. Ritchie) and the district attorney. Both responded, under oath, to Appellant's allegations. Ritchie filed an affidavit, as did District Attorney Michael Burns. Appellant alleged there was a conflict of interest because Ritchie was Burn's campaign treasurer and because Ritchie and Judge Ray had been law partners. First, Ritchie and Judge Ray were never law partners, and as to the former allegation of a conflict of interest between Burns and Ritchie, Appellant has not explained how this creates a conflict of interest, especially in light of the controverting affidavits. The mere possibility of a conflict of interest is insufficient to impugn a criminal conviction. *Hearn v. State*, No. 11-06-00294-CR, 2008 WL 97004, at *7 (Tex. App.—Eastland Jan. 10, 2008, pet. ref'd) (not

14

designated for publication) (citing *Pina v. State*, 29 S.W.3d 315, 317 (Tex. App.— El Paso 2000, pet. ref'd)).

We hold that the trial court did not abuse its discretion when it did not hold a hearing on the motion for new trial and permitted Appellant's motion to be overruled by operation of law. Moreover, even if we were to consider the unsworn information, our analysis and conclusions would not change. Therefore, we overrule Appellant's second issue.

### C. Ineffective Counsel Claim

Appellant claims that his trial counsel was ineffective for three reasons: (1) he failed to preserve Appellant's right to confrontation at the *Jackson v. Denno* hearing; (2) he failed to request a jury instruction on necessity after the State raised a felon-in-possession allegation; and (3) he failed to request a jury instruction on sudden passion during the punishment phase of trial.

The benchmark for evaluating an ineffective assistance of counsel claim is whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The *Strickland* test has two prongs: (1) a performance standard and (2) a prejudice standard. *Id.* at 687. For the performance standard, we must determine whether Appellant has shown that counsel's representation fell below an objective standard of reasonableness. *Id.* If so, we then determine whether there is a reasonable probability that the outcome would have differed but for counsel's errors. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland*, 466 U.S. at 686; *Andrews v. State*, 159 S.W.3d 98 (Tex. Crim. App. 2005).

The reasonable probability must rise to the level that it undermines confidence in the outcome of the trial. *Isham v. State*, 258 S.W.3d 244, 250 (Tex. App.—Eastland 2008, pet. ref'd). A failure to make a showing under either prong

of the *Strickland* test defeats a claim of ineffective assistance of counsel. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010); *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). A reviewing court need not consider both prongs of the *Strickland* test and can dispose of an ineffectiveness claim on either prong. *Walker v. State*, 406 S.W.3d 590, 594 (Tex. App.—Eastland 2013, pet. ref'd) (citing *Cox v. State*, 389 S.W.3d 817, 819 (Tex. Crim. App. 2012)); *see Strickland*, 466 U.S. at 697.

The first prong of *Strickland* requires Appellant to establish that trial counsel provided deficient assistance of counsel. There is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Isham*, 258 S.W.3d at 250. To overcome this deferential presumption, an allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). In most cases, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Id.*

Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768 (Tex. Crim. App. 1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref'd). Generally, the record on direct appeal will not be sufficient to show that trial counsel's representation was so lacking as to overcome the presumption of reasonable conduct. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). We do not inquire into trial strategy unless no plausible basis exists for trial counsel's actions. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. 1981). When the record contains no evidence of the reasoning behind trial counsel's actions, we cannot conclude that counsel's performance was deficient. *Jackson*, 877 S.W.2d at 771.

Appellant alleged that trial counsel was ineffective at the *Jackson v. Denno* hearing because he did not challenge the State's evidence on voluntariness, including whether Appellant received *Miranda* warnings and whether Appellant's level of intoxication vitiated any consent or any waiver of his *Miranda* rights. Appellant argues that his trial counsel should have called witnesses. As we already have explained, Appellant's statements in the first two interviews, in which he waived his *Miranda* rights, are not applicable because they were never used at trial. And there was never any dispute in the trial court regarding the voluntariness of the third statement. The DVD clearly shows that Appellant received, for the third time, and waived, for the third time, his *Miranda* rights. Appellant also has not explained on appeal, nor does the record reveal, why trial counsel's action in not challenging voluntariness was not appropriate trial strategy. Appellant has failed to meet the first prong of *Strickland.* We need not address the prejudice prong.

Appellant next claims that his counsel should have asked the trial court to instruct the jury on the defense of necessity during the guilt/innocence phase of the trial. However, he argues that the instruction should have been given in connection with a firearms violation. He was not tried for a firearms violation; he was tried for murder. Therefore, he was not entitled to the instruction in this trial.

Appellant also argues that trial counsel should have asked the trial court to instruct the jury on the issue of sudden passion. At the punishment stage of a trial, a defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX. PENAL CODE ANN. § 19.02(d) (West 2011). "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation. *Id.* § 19.02(a)(2). "Adequate cause" means cause that would commonly produce a degree of anger,

rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. *Id.* § 19.02(a)(1). As we have already explained, Appellant, not Kim, provoked the difficulty. Nothing in the record raises sudden passion stemming from an adequate cause. Thus, Appellant was not entitled to a sudden passion instruction.

Scattered throughout Appellant's brief are other allegations of ineffective assistance of counsel. However, Appellant points to no evidence in the record to support the allegations and offers no citation to authority in support of the allegations. Appellant's failure to adequately brief these issues, with citations to the record and case law, results in a waiver of these points. TEX. R. APP. P. 38.1; *see Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003); *Nickols v. State*, No. 11-11-00203-CR, 2013 WL 4715681 (Tex. App.—Eastland Aug. 30, 2013, no pet.) (mem. op., not designated for publication). We overrule Appellant's third issue.

## VI. *Conclusion*

After reviewing the record, we hold that the trial court did not abuse its discretion when it admitted Appellant's confession from the third interview because Appellant knowingly and intelligently waived his *Miranda* rights. Also, for the reasons stated in this opinion, we hold that the trial court did not abuse its discretion when it denied Appellant's motion for new trial without holding a hearing. Finally, for all of the reasons set out earlier in this opinion, Appellant has not shown that his trial counsel rendered ineffective assistance.

## VII. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

JUSTICE

July 17, 2014

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.